IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| WARREN WALKER, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civil No. BPG-16-3623 |
| UNITED STATES OF AMERICA, | * | |
| Defendant. | * | |

\* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiffs Warren Walker, Jerry Dorsey, and Jalisa Carrington brought this negligence action against the United States of America, through its agents and agencies, including the U.S. Department of Health and Human Resources, which operated and funded the Baltimore Medical System and the Belair-Edison Family Health Center. This Memorandum Opinion and the Order that accompanies it address plaintiffs' claim.

### I. PROCEDURAL BACKGROUND

On April 5, 2018, with the consent of the parties, this matter was referred to the undersigned for all proceedings. (ECF Nos. 26, 35, 36). On September 26, 2018, and September 27, 2018, a two-day bench trial was conducted. (ECF Nos. 45, 46). I have carefully considered the exhibits admitted into evidence (Joint Exhibits 1–3, Plaintiffs' Exhibits 1–5, Defendant's Exhibits 1, 3), the testimony of the witnesses (Dr. Carissa Guishard-Gibson, Dr. Marc Itskowitz, Jerry Dorsey, Warren Walker, Jalisa Carrington, Dr. Michael Hattwick, and Dr. E. James Britt), and the written submissions of the parties. For the reasons set forth below, I find that plaintiffs have failed to establish their claim for negligence. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, my findings of fact and conclusions of law are set forth separately below.

## II. FINDINGS OF FACT

On August 18, 2014, Vanessa Kelly, aged 62 years old, attended a 3:15 p.m. scheduled appointment at the Belair-Edison Family Health Center ("BEFHC"). BEHFHC is a delivery site for the Baltimore Medical System, which is eligible for Federal Tort Claims Act ("FTCA") coverage by the Secretary of Health and Human Services ("HHS") pursuant to the Federally Supported Health Centers Assistance Act ("FSHCAA"). Ms. Kelly was treated by Carissa Guishard-Gibson, M.D., an employee of the Baltimore Medical System. Ms. Kelly reported to Dr. Guishard-Gibson that she was experiencing shortness of breath ("SOB") that had worsened over the past week and that intensified after taking a few steps. Ms. Kelly reported that the severity of her SOB was 9. Ms. Kelly also complained of pleuritic pain, a cough that was initially productive but then dry, wheezing, and palpitations.

A BEFHC medical assistant took Ms. Kelly's vital statistics: blood pressure 122/80, pulse 97, oxygenation 95% on room air, and respirations 20. Ms. Kelly's history was also taken and Ms. Kelly reported that she had hypertension but that she rarely took her blood pressure medication. Dr. Guishard-Gibson physically examined Ms. Kelly by listening to her heart and lungs. Dr. Guishard-Gibson documented Ms. Kelly's respiratory and cardiovascular findings as normal. Dr. Guishard-Gibson also noted that Ms. Kelly did not appear sick as though having pneumonia or an upper respiratory infection. Dr. Guishard-Gibson diagnosed Ms. Kelly with acute SOB and prescribed bronchodilators and a cough suppressant. She also ordered a chest x-ray and told Ms. Kelly to follow-up with her primary care physician within a week. Dr. Guishard-Gibson generated a patient note for Ms. Kelly at 4:12 p.m. following the conclusion of Ms. Kelly's appointment.

Ms. Kelly then drove herself and her adult daughter, Jalisa Carrington, to Walmart to fill her prescriptions. Ms. Kelly shopped while waiting for her prescriptions to be filled, but her

condition began to deteriorate. At 5:34 p.m., 911 was called. An ambulance arrived at 5:40 p.m. and emergency medical services ("EMS") workers began to administer medical care to Ms. Kelly. The ambulance arrived at Franklin Square Hospital ("FSH") at 6:01 p.m.

Upon arrival at FSH, Ms. Kelly was admitted, and hospital physicians ordered tests including a chest x-ray, echocardiogram, computed tomography ("CT") angiography, and blood tests. At 7:28 p.m., Ms. Kelly went into cardiac arrest. The emergency room physicians administered a thrombolytic agent, tissue plasminogen activator ("tPA"), and at 7:50 p.m., a consistent pulse was established. At 9:25 p.m., Ms. Kelly was transported to the intensive care unit ("ICU"). At 10:38 p.m., Ms. Kelly went into cardiac arrest again. The doctors were unable to resuscitate her, and Ms. Kelly was pronounced dead at 11:02 p.m. An autopsy revealed that Ms. Kelly had both acute and chronic pulmonary emboli. The cause of Ms. Kelly's death was recorded as "due to (or as a consequence of) pulmonary embolus." (Plaintiffs' Ex. 5).

## III. LEGAL ANALYSIS[1] AND CONCLUSIONS OF LAW

The Federal Tort Claims Act ("FTCA")[2] contains a limited waiver of sovereign immunity of the United States in tort matters, making the United States liable "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. The FTCA provides for money damages for negligence of employees of the United States, acting within the scope of their employment, "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b); Miller v. United States, 308 F. Supp. 2d 604, 607 (D. Md. 2003). Because the medical treatment at issue in this case occurred in Maryland, Maryland law

---

[1] In its pretrial memorandum, defendant included a summary of controlling law. (ECF No. 41 at 2–5). Plaintiffs had no objection to this summary, so the Court will adopt it in full.

[2] The parties have stipulated to the fact that the Federal Tort Claims Act governs the instant action because Carissa Guishard-Gibson, M.D. is deemed a federal employee pursuant to the Federally Supported Health Centers Assistance Act ("FSHCAA") and was acting within the scope of her employment during the care provided to Ms. Kelly on August 18, 2014. (Joint Pretrial Order ¶ 6).

3

regarding the substantive elements of medical negligence applies. Goodie v. United States, No. RDB-10-3478, 2013 WL 968198, at *4 (D. Md. March 12, 2013) (citing Miller, 308 F. Supp. 2d at 607).

In this medical malpractice action, plaintiffs must show by a preponderance of the evidence (1) the applicable standard of care, (2) that this standard has been violated, and (3) a causal relationship between the violation and the harm complained of. See Fitzgerald v. Manning, 679 F.2d 341, 346 (4th Cir. 1982). The plaintiffs bear the burden of proof on each element. Weimer v. Hetrick, 525 A.2d 643, 651 (Md. 1987) (citing Shilkret v. Annapolis Emergency Hosp. Ass'n, 349 A.2d 245, 247 (Md. 1975); Paige v. Manuzak, 471 A.2d 758, 766-67 (Md. Ct. Spec. App. 1984)).

### A. Standard of Care and Breach

Maryland law presumes that "the doctor has performed [her] medical duties with the requisite care and skill." Riley v. United States, 248 F. Supp. 95, 97 (D. Md. 1965) (quoting Lane v. Calvert, 138 A.2d 902, 905 (Md. 1958)). The standard of care for healthcare providers in Maryland requires providers to "exercise the degree of care or skill expected of a reasonably competent health care provider in the same or similar circumstances." Crise v. Md. Gen. Hosp., 69 A.3d 536, 553 (Md. Ct. Spec. App. 2013) (citing Shilkret, 349 A.2d at 253). Maryland law does not require a doctor to provide optimal care; rather, "the law only requires that the care be reasonably competent and be acceptable to other members of the medical profession." Kroll v. United States, 708 F. Supp. 117, 118 (D. Md. 1989). Maryland law requires plaintiffs to prove a breach in the standard of care (and causation) by expert testimony to a reasonable degree of probability. Jacobs v. Flynn, 749 A.2d 174, 180 (Md. Ct. Spec. App. 2000). The "mere fact

that an unsuccessful result follows medical treatment is not of itself evidence of negligence." Kennelly v. Burgess, 654 A.2d 1335, 1340 (Md. 1995) (quoting Lane, 138 A.2d at 905).

Plaintiffs offered the testimony of Marc Itskowitz, M.D., an expert in the field of internal medicine and the diagnosis and treatment of pulmonary embolism. Dr. Itskowitz testified that Ms. Kelly was at risk for pulmonary embolism due to her age and obesity, that she showed five symptoms of pulmonary embolism (SOB, pleuritic chest pain, cough, wheezing, and palpitations), and that three of her vital signs were borderline (pulse, oxygenation, and respiration). Therefore, pulmonary embolism needed to be, according to Dr. Itskowitz, on Dr. Guishard-Gibson's differential diagnosis for Ms. Kelly.[3] Dr. Itskowitz testified that pulmonary embolism is a life-threatening condition, and that when there is a life-threatening condition on a differential diagnosis, a physician must rule out that life-threatening condition as a possible diagnosis. Dr. Itskowitz testified that the standard of care for Ms. Kelly required Dr. Guishard-Gibson to send Ms. Kelly to the emergency room so that Ms. Kelly could be emergently evaluated, diagnosed, and treated for pulmonary embolism. In his opinion, Dr. Guishard-Gibson breached this standard of care by failing to send Ms. Kelly to the emergency room directly following her appointment.

Dr. Itskowitz also testified that the Wells' Criteria, which Dr. Guishard-Gibson testified that she used in evaluating Ms. Kelly,[4] are seven clinical criteria that are used to help determine if a patient is at risk of a blood clot and should only be used in conjunction with another test. He testified that, in the last twenty years, the Wells' Criteria have been found not to be sufficiently sensitive for clinical use and that the diagnostic failure rate is high. Dr. Itskowitz opined that it was not sufficient for Dr. Guishard-Gibson to rely solely on the Wells' Criteria to rule out

---

[3] Although Dr. Guishard-Gibson testified that pulmonary embolism was in her differential diagnosis for Ms. Kelly, there is no mention of pulmonary embolism in any of the records from BEHFC.
[4] There is no mention of the Wells' Criteria in the BEHFC medical records.

5

pulmonary embolism as a possible diagnosis under the standard of care in this case, when there were clear risk factors, signs, and symptoms of pulmonary embolism. At a minimum, he testified, Dr. Guishard-Gibson was required to order a D-dimer test,[5] and preferably, a CT scan, to eliminate pulmonary embolism as a possible diagnosis. In his opinion, Dr. Guishard-Gibson breached the standard of care by using only the Wells' Criteria in this case.

The Government presented the testimony of Michael Hattwick, M.D., an expert in the field of internal medicine, to counter Dr. Itskowitz' opinion. Dr. Hattwick testified that the standard of care requires (1) taking a history, (2) doing an appropriate physical examination based on the history, (3) doing tests, if any are indicated based on the history and physical examination, (4) using clinical judgment to reach a tentative diagnosis, and (5) initiating treatment. Dr. Hattwick noted that, here, Dr. Guishard-Gibson took a history, conducted a physical examination, specifically, listened to Ms. Kelly's lungs, did testing (vitals and oxygenation), reached a tentative diagnosis of SOB, and initiated treatment by ordering additional testing (a chest x-ray) and prescribing bronchodilators and a cough suppressant.

Dr. Hattwick also opined that it was reasonable for Dr. Guishard-Gibson to order additional tests and follow up with Ms. Kelly on an outpatient basis based on Ms. Kelly's normal vital signs and physical examination. He testified that the standard of care only requires a patient to be sent to the emergency room if there is testing that needs to be done that cannot be done in the office. According to Dr. Hattwick, the Wells' Criteria are used to help determine whether such additional testing is needed. Dr. Hattwick also testified that it was appropriate for Dr. Guishard-Gibson to use the Wells' Criteria when using her clinical judgment to reach a tentative diagnosis of shortness of breath, to be reevaluated once she received Ms. Kelly's chest x-ray. He

---

[5] Dr. Itskowitz testified that a D-dimer test is a blood test used to rule out the possibility of pulmonary embolism, if negative. If positive, a CT scan is necessary to diagnose pulmonary embolism.

opined that Ms. Kelly would score zero on the Wells' Criteria, which would rule out the need for additional testing for pulmonary embolism. Accordingly, it was reasonable, in his opinion, for Dr. Guishard-Gibson to treat the more likely diagnoses, which were bronchitis and pneumonia, and revisit her diagnosis after additional testing.

In weighing the expert testimony in this case, I have considered the training, qualifications, and practical experience of the experts, as well as the nature and substance of the testimony offered. Based upon those considerations, I conclude that Dr. Itskowitz' opinion regarding the breach of the standard of care is persuasive and should be given significant weight. He is board certified in internal medicine and treats patients with, or suspected of having, pulmonary embolism at an outpatient practice similar to BEFHC. He testified about his own practice and experience in diagnosing, treating, and following up on patients with suspected and diagnosed pulmonary embolism. He also identified a clear standard of care that applied in this case based on the specific facts and patient characteristics. Dr. Hattwick, while qualified as an expert in internal medicine, merely stated a general standard that would apply in any interaction between a physician and patient and that would only result in a breach if a physician were to neglect a significant duty, such as failing to take a patient history or failing to conduct a physical examination. Dr. Hattwick also testified that, although he thought it was appropriate for Dr. Guishard-Gibson to use the Wells' Criteria, he does not use the Wells' Criteria in his own practice.

Dr. Itskowitz noted that Ms. Kelly presented with risk factors, symptoms, and signs of pulmonary embolism. He opined that pulmonary embolism needed to be on Dr. Guishard-Gibson's differential diagnosis based on these factors, symptoms, and signs, and acknowledged that Dr. Guishard-Gibson had testified that it was on her differential diagnosis. Given that

7

pulmonary embolism was the only life-threatening condition on Dr. Guishard-Gibson's differential diagnosis, Dr. Itskowitz concluded that it needed to be definitively ruled out by appropriate testing and not merely by reliance on the Wells' Criteria. He noted that Dr. Guishard-Gibson did not have the resources to rule out pulmonary embolism at her facility, and therefore needed to send Ms. Kelly to a hospital. Further, as Dr. Itskowitz testified, it was not reasonable for Dr. Guishard-Gibson to merely diagnose Ms. Kelly with shortness of breath, the same complaint that she presented with.[6]

For the reasons noted above, and in reliance upon the opinion of Dr. Itskowitz, I conclude that plaintiffs have established by a preponderance of the evidence that Dr. Guishard-Gibson did not "exercise the degree of care or skill expected of a reasonably competent health care provider in the same or similar circumstances." Crise v. Md. Gen. Hosp., 69 A.3d 536, 553 (Md. Ct. Spec. App. 2013) (citing Shilkret v. Annapolis Emergency Hosp. Ass'n, 349 A.2d 245, 253 (Md. 1975)). I find that plaintiffs have established to a reasonable degree of probability, Jacobs v. Flynn, 749 A.2d 174, 180 (Md. Ct. Spec. App. 2000), that Dr. Guishard-Gibson breached the standard of care by failing to rule out pulmonary embolism as a possible diagnosis by sending Ms. Kelly to a hospital for appropriate testing immediately following her appointment.

B. Causation

In Maryland, there is no recovery for loss of chance; it is insufficient for a plaintiff to prove that a patient lost a substantial, though less than probable, chance of survival. See Fennell

---

[6] BEHFC records list shortness of breath under the section "Assessment/Plan." While Dr. Guishard-Gibson noted that Ms. Kelly didn't "appear sick though [sic] as if having pneumonia or URI," she did not make any further diagnoses, but merely ordered a chest x-ray and prescribed bronchodilators and a cough suppressant. Dr. Itskowitz noted that, even if shortness of breath was merely a provisional diagnosis that would be updated after receiving the results of Ms. Kelly's chest x-ray, it was not reasonable for Dr. Guishard-Gibson to wait for the results, as it was critical that Ms. Kelly be emergently evaluated for pulmonary embolism.

v. S. Md. Hosp. Ctr., 580 A.2d 206, 215 (Md. 1990) (declining to recognize damages for loss of chance in survival actions); Weimer v. Hetrick, 525 A.2d 643, 652 (Md. 1987) (declining to recognize damages for loss of chance in wrongful death actions). Instead, plaintiffs must show that the alleged departure from the standard of care was a cause in fact of their injury. See Maryland Civil Pattern Jury Instruction 19:10; see also Lane v. Calvert, 138 A.2d 902, 905 (Md. 1958). Causation in fact concerns the threshold question of "whether defendant's conduct actually produced an injury." Pittway Corp. v. Collins, 973 A.2d 771, 786–88 (Md. 2009) (quoting Peterson v. Underwood, 264 A.2d 851, 855 (Md. 1970)); see also Jacobs v. Flynn, 749 A.2d 174, 180 (Md. Ct. Spec. App. 2000) ("As with other cases, in order to prove causation, a medical malpractice plaintiff must establish that but for the negligence of the defendant, the injury would not have occurred."). Stated differently, a plaintiff must show that it is more likely than not that the defendant's conduct was a substantial factor in producing the plaintiff's harm. See Reed v. Campagnolo, 630 A.2d 1145, 1152 (Md. 1993); Eagle-Picher Indus., Inc. v. Balbos, 604 A.2d 445, 459 (Md. 1992). Negligent conduct is not a substantial factor if the harm would have been sustained in the absence of the original negligence. Collins v. Li, 933 A.2d 528, 552 (Md. Ct. Spec. App. 2007), aff'd sub nom Pittway Corp. v. Collins, 973 A.2d 771 (Md. 2009) (citing Restatement (Second) of Torts § 432 (Am. Law Inst. 1965)).

Plaintiffs' expert, Dr. Itskowitz, testified that, had Ms. Kelly been sent to the emergency room immediately following her appointment with Dr. Guishard-Gibson, she would have survived. He testified that Ms. Kelly's office visit concluded around 4:00 to 4:15 p.m., that she would arrive at the hospital within approximately fifteen minutes, and that she would then be rapidly treated. He stated that he would, and routinely does, call ahead to the emergency room to inform the doctors that he was sending over a patient with risk factors and symptoms of

pulmonary embolism. Upon her arrival, she would be assessed by a nurse in triage and a doctor would conduct a physical examination and review her history. Next, the doctor would order diagnostic testing, i.e., a D-dimer test, metabolic panel, blood count, and echocardiogram. Dr. Itskowitz testified that, then, if the D-dimer test was positive, the physician would order a CT scan to confirm a diagnosis of pulmonary embolism. He further testified that the standard of care in the emergency room is to start anticoagulation medicine (heparin) pending results of the CT scan unless the results are available within fifteen minutes. Dr. Itskowitz opined that if Ms. Kelly were placed on heparin, she would not have suffered a severe pulmonary embolism. He testified that heparin prevents new blood clots from forming and that it is extremely rare for a patient to develop a clot and suffer a severe pulmonary embolism once on anticoagulation medicine. Accordingly, Dr. Itskowitz testified that, had Ms. Kelly been sent to the emergency room immediately following her BEHFC appointment, Ms. Kelly would have received heparin by 5:30 p.m.[7] and would not suffered a severe pulmonary embolism.

Dr. Itskowitz also opined that, even if Ms. Kelly did experience an acute pulmonary embolism while in the hospital, she would have survived. Dr. Itskowitz testified that patients with severe pulmonary embolism typically die because of strain to the right side of the heart. He stated that, if Ms. Kelly had been in the emergency room when she experienced the pulmonary embolism, the physicians could have supported her heart by treatment, including administration of heparin and tPA,[8] and saved her life. Based on his testimony, plaintiffs set forth two theories regarding causation. First, Ms. Kelly would not have had a pulmonary embolism if she had been sent to the hospital, as she would have been administered heparin upon arrival. Second, even if

---
[7] The experts do not dispute that Ms. Kelly experienced a pulmonary embolism while at Walmart, at approximately 5:30 p.m.
[8] Dr. Britt testified that tPA is used to break down existing blood clots.

10

she did have a pulmonary embolism, she would have survived if she had the pulmonary embolism in the hospital instead of at Walmart.

The Government offered the testimony of Dr. E. James Britt, an expert in the fields of internal medicine, pulmonology medicine, and critical care medicine, regarding the proximate cause of Ms. Kelly's death. Dr. Britt testified based on his training, education, and experience, and to a reasonable degree of medical certainty, that the outcome would have been the same if Ms. Kelly went immediately to the hospital following her appointment with Dr. Guishard-Gibson. Dr. Britt noted that Ms. Kelly had normal vital signs and was stable when she left BEFHC between 4:00 and 4:15 p.m. He testified that if Ms. Kelly arrived at the emergency room in this stable state, she would be admitted as a diagnostic case, rather than an emergency room patient. According to Dr. Britt, it is more likely than not that the doctors at the hospital would have ordered a D-dimer test based upon a suspicion of pulmonary embolism. If the D-dimer test was positive, the doctors would order a creatinine test to ensure Ms. Kelly had normal kidney function, then perform a CT scan to confirm a diagnosis of pulmonary embolism. Dr. Britt testified that this entire process would take approximately two hours.

Dr. Britt testified that Ms. Kelly would not have been prescribed heparin, an anticoagulant, before pulmonary embolism was her confirmed diagnosis. He testified that most patients entering with a suspicion of pulmonary embolism are not immediately prescribed heparin, but that, instead, doctors first attempt to obtain a diagnosis to prevent exposing patients to the risk of anticoagulation medicine. He testified that, more likely than not, Ms. Kelly would have only been prescribed heparin once the results of the D-dimer and CT scan confirmed the doctors' suspicions of pulmonary embolism, which would occur approximately two hours after her admission. Thus, according to Dr. Britt, even if Ms. Kelly went directly to the emergency

11

room from BEHFC, it is more likely than not that Ms. Kelly would have experienced the pulmonary embolism, which occurred at approximately 5:30 p.m., before any heparin was administered.

Additionally, Dr. Britt testified that it is speculative to conclude that Ms. Kelly would not have suffered a pulmonary embolism even if she had been administered heparin upon arrival to the hospital, as Dr. Itskowitz opined would happen. Dr. Britt testified that heparin would only prevent future clots from forming and would not dissolve existing clots. Dr. Britt testified that only tPA breaks up existing clots and that Ms. Kelly would not have been given tPA until pulmonary embolism was her confirmed diagnosis, due to the risk of hemorrhaging associated with tPA. Accordingly, Dr. Britt testified that, even if Ms. Kelly was given heparin, it is possible that Ms. Kelly would have still experienced a pulmonary embolism due to a pre-formed clot. Dr. Britt further opined that Ms. Kelly's survival aspects would have been the same if she experienced the pulmonary embolism while at the hospital. He testified that Ms. Kelly was given all available treatments upon her arrival to the hospital, but that when acute events such as a severe pulmonary embolism occur, mortality occurs. Accordingly, Dr. Britt opined, to a reasonable degree of medical certainty, that it is more likely than not that Ms. Kelly would not have survived even if she was in the hospital when she experienced the pulmonary embolism.

After weighing the expert testimony, considering the experts' practical experience, training, and expertise, and evaluating the opinions offered, I conclude that Dr. Britt's opinion regarding causation is more persuasive and should be given significant weight for the reasons noted below. First, Dr. Britt's experience and expertise in this area of medical practice is extensive. Dr. Britt has worked in pulmonary medicine at the University of Maryland for twenty-eight years and is experienced in internal, pulmonary, and critical care medicine. He

testified that he primarily practices in an outpatient clinic, but that he also spends two weeks out of every month in the hospital, working in the ICU and emergency room. He also testified that he sees fifteen or sixteen patients diagnosed with pulmonary embolism per year, that he had prescribed heparin to a patient within the last month, and that he had prescribed tPA to a patient in the last year. Dr. Itskowitz, on the other hand, specializes in internal medicine and treats patients on an outpatient basis at a practice similar to BEHFC. While he follows up on the patients that he has referred to the hospital, he does not regularly treat patients in the emergency room as Dr. Britt does. Indeed, Dr. Itskowitz testified that the last time that he prescribed tPA was during his residency. Thus, based on Dr. Britt's relevant experience, I give his testimony significant weight.

Second, I find Dr. Britt's testimony more persuasive because it was clear, concise, and consistent with the evidence while Dr. Itskowitz' testimony concerning the timing of events at the hospital was speculative and not consistent with the evidence. Dr. Itskowitz first opined that Ms. Kelly would not have suffered a pulmonary embolism had she been sent to the emergency room from BEHFC because she would have received heparin before 5:30 p.m. and that the pulmonary embolism would not have occurred. That conclusion is not supported by the sequence of events in this case and is inconsistent with the rest of Dr. Itskowitz' testimony. Ms. Kelly left BEHFC between 4:00 and 4:15 p.m., so she would have likely arrived at the hospital between 4:15 and 4:30 p.m. Dr. Itskowitz testified that Ms. Kelly would then be assessed by a nurse in triage and, thereafter, a doctor would perform a physical examination. The doctor would then order diagnostic tests, including a D-dimer test, metabolic panel, blood count, and echocardiogram. Although Dr. Itskowitz testified at trial that all of these steps could be completed in fifteen minutes, he testified at his deposition that this process could take up to thirty

to sixty minutes. Accordingly, these tests would be completed anywhere between 4:30 p.m. and 5:30 p.m. Dr. Itskowitz testified that, then, if the D-dimer test was positive, the physician would order a CT scan. On cross-examination, he testified that it would take up to an hour to receive these results, so the results would be available anywhere between 5:30 p.m. and 6:30 p.m. Similarly, Dr. Britt testified that it would take two hours to complete all diagnostic testing. While Dr. Itskowitz testified at trial that the standard of care is to begin heparin pending the results of the CT exam, Dr. Britt testified that heparin would not be administered until the results were received due to the risks associated with administering heparin. Based on his experience treating patients like Ms. Kelly in the emergency room, I find Dr. Britt's opinion that heparin would not be administered until the results of the CT exam were received to be persuasive. Both Dr. Itskowitz and Dr. Britt's testimony supports the conclusion that the CT exam results would not be received until after 5:30 p.m., which the experts do not dispute is the approximate time that she suffered an acute pulmonary embolism. Accordingly, I find that Dr. Itskowitz' testimony that Ms. Kelly would not have suffered a pulmonary embolism if she had been sent to the emergency room immediately after leaving BEHFC is not entitled to significant weight.

Dr. Itskowitz also testified that, alternatively, if Ms. Kelly did experience a pulmonary embolism while in the hospital, she would have survived, but this testimony is inconsistent with the facts of what actually happened upon Ms. Kelly's admission to the emergency room. Dr. Itskowitz testified that, if Ms. Kelly had experienced the pulmonary embolism in the hospital, she would have survived because the physicians would have been able to support her heart and treat her immediately with heparin or tPA. Yet, here, Ms. Kelly did not immediately receive heparin or tPA. Instead, the emergency room physicians ordered tests to confirm the diagnosis, to include a chest x-ray, echocardiogram, CT scan, and blood tests. Ms. Kelly was in the

emergency room for approximately one and one-half hours, still undergoing diagnostic testing, when she went into cardiac arrest. Further, Dr. Britt testified that, had Ms. Kelly been in the hospital when she experienced the pulmonary embolism, she would have been treated in the same fashion that she was upon her admission to the hospital. I find that Dr. Britt's testimony is credible, as it is supported by on his experience treating patients like Ms. Kelly in the emergency room. Accordingly, Dr. Itskowitz' testimony that Ms. Kelly would have survived if she experienced the pulmonary embolism in the hospital is not supported by Ms. Kelly's course of treatment upon her admission to the emergency room and is not entitled to significant weight.

For the reasons stated above, and in reliance on Dr. Britt's opinion, I find that plaintiffs have failed to establish by a preponderance of the evidence a causal relationship between the breach of the standard of care and the harm complained of. See Pittway Corp. v. Collins, 973 A.2d 771, 786–88 (Md. 2009) (quoting Peterson v. Underwood, 264 A.2d 851, 855 (Md. 1970)); see also Jacobs v. Flynn, 749 A.2d 174, 180 (Md. Ct. Spec. App. 2000). Specifically, plaintiffs have not met their burden of establishing that Dr. Guishard-Gibson's departure from the standard of care was a "cause in fact" of Ms. Kelly's death. See Maryland Civil Pattern Jury Instruction 19:10; see also Lane v. Calvert, 138 A.2d 902, 905 (Md. 1958). Plaintiffs have not shown that Dr. Guishard-Gibson's negligent conduct was a substantial factor in causing Ms. Kelly's death, as plaintiffs have failed to establish by a preponderance of the evidence that Ms. Kelly's death would not have occurred in the absence of Dr. Guishard-Gibson's original negligence. Collins v. Li, 933 A.2d 528, 552 (Md. Ct. Spec. App. 2007), aff'd sub nom Pittway Corp. v. Collins, 973 A.2d 771 (Md. 2009) (citing Restatement (Second) of Torts § 432 (Am. Law Inst. 1965)). Accordingly, plaintiffs have failed to meet their burden of proving their claim of negligence.

## IV. CONCLUSION

For the reasons set forth above, I conclude that plaintiffs have failed to establish their claim for negligence. A separate order will be issued entering judgment on behalf of the Government and directing the Clerk to close the case.

December  17 , 2018                                         /s/
                                              Beth P. Gesner
                                              Chief United States Magistrate Judge